**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CARRI L. DIACK, ) | |
| ) | CASE NO. 1:12-cv-02513 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Carri L. Diack ("Diack") challenges the final decision of the Commissioner of Social Security ("Commissioner"), denying Diack's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

**I. Procedural History**

On March 23, 2009, Diack filed an application for POD, DIB, and SSI alleging a disability onset date of September 27, 2007. (Tr. 22, 123.) Her application was denied both initially and upon reconsideration. Diack timely requested an administrative hearing.

On May 24, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Diack, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 22.) On July 11, 2011, the ALJ found Diack was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 37.) The ALJ's decision became final when the Appeals Council denied further review.

## II. Evidence

*Personal and Vocational Evidence*

Age forty (40) at the time of her administrative hearing, Diack is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563 & 416.963. She has a high school education and past relevant work as an assembler, dispatcher, and operations manager. (Tr. 36, 62.)

*Hearing Testimony*

At the hearing, Diack testified as follows:

- She has difficulty walking due to pain in her hips and legs. Her arms are weak, her hands swell, and she has tremors. She suffers migraine headaches daily. She has blurred vision. (Tr. 63.) Her medical providers told her that her impairments are caused by Lupus and Sjögren's syndrome. (Tr. 64.)

- She last worked in 2008 performing assembly work in a factory. (Tr. 63.)

- She lives with her husband and two children, ages seven and eleven. Her children are "self-sufficient." (Tr. 63.)

- She can drive, but her husband does most of the driving. (Tr. 64.)

- She has been using a wheelchair for four to five years. It was not prescribed and her husband obtained it for her. (Tr. 65.) However, she stated that three years earlier, when she was working in 2008, she did not use the wheelchair. (Tr. 65.)

- She has asthma, but still smokes three cigarettes a day. (Tr. 66-67.)

- She experiences pain in her hips, which goes down her legs. (Tr. 67.)

- She has numbness and tingling in her hands and arms and constant swelling in her hands, feet, and legs. (Tr. 67-68.)

- Some days her symptoms are worse than others. (Tr. 67.) On a bad day, she does not get out of bed. She has more bad days than good days. (Tr. 68.)

- She does not have trouble getting along with other people, but noted increased irritability as of late. (Tr. 69.)

- She described her migraines as a constant headache which nothing helps. (Tr. 69.)

- She did not remember how long she had been treating with Dr. Van Warren and Dr. Kurtz. (Tr. 69.)

- She has difficulty with memory and concentration and requires reminders. (Tr. 70.)

- She has difficulty with her own personal hygiene, and showers only weekly. Her husband and children help her dress. (Tr. 70.)

- She does not perform any household chores. (Tr. 70.)

- Her medications include Ritalin, Neurontin, Amnitryptoline, Plavix, Topamax, Zocor, Tiquinel [phonetic], Vicodin, and Lyrica. Her side effects include dizziness and difficulty sleeping. (Tr. 71.)

- She recently suffered a heart attack. (Tr. 71.)

The ALJ posed the following hypothetical to the VE:

Assume a hypothetical individual of the same age, education and work experience as Mrs. Diack. And the following physical and mental limitations for this first hypothetical. I am basing the physical RFC on Exhibit 11-F, which provides for lifting and carrying including upper pulling, 20 pounds occasionally, 10 pounds frequently. Standing, walking and sitting with normal breaks, six out of eight hours. Pushing and pulling, including hand/foot controls unlimited within those exertional limitations. No postural, manipulative, visual, communicating or environmental limitations.

And then the following mental [RFC], which I am basing on Exhibit 13-F: The individual is able to complete simple, repetitive tasks without strict time pressures

> or production quotas. Able to work around others, including the public. Able to interact on a superficial and occasional level with others, but not with the public. Can handle infrequent changes.

(Tr. 77.)

The VE testified that such an individual would be unable to perform Diack's past relevant work. (Tr. 78.) However, the VE stated that such an individual could perform some light exertional jobs, and offered the following examples: housekeeping/cleaner – Dictionary of Occupational Titles ("DOT") § 2323687014, mail clerk – DOT § 209687026, and product marker – DOT § 209587034. (Tr. 78.)

The ALJ posed a second hypothetical to the VE:

> I'm basing the [RFC] on exhibit 18-F, which is from Dr. VanWarren. Lifting and carrying five pounds occasionally [and] frequently, standing and walking two [h]our of eight hours, ten minutes without interruption. Sitting four out of eight hours, one hour without interruption. No climbing, balancing, stooping, crouching, kneeling or crawling. Frequent reaching, handling, pushing and pulling. Avoid concentrated exposure to heights, moving machines, temperature extremes, fumes, vibrations.
>
> And then the following mental [RFC], which I am basing on Exhibit 22, which provides that the individual is unable to maintain attention and concentration for extended periods of time. Unable to travel in unfamiliar places or use public transportation.

(Tr. 78-79.)

The VE testified that such an individual would be unable to perform Diack's past relevant work. (Tr. 79.) In addition, the VE stated that no other jobs would be available, as the inability to sit at least six hours precluded all full-time, competitive employment. *Id.* In response to questions from Diack's counsel, the VE testified that an individual who was off task 25 percent of the day or missed more than four days of work per month would be unemployable. (Tr. 80.)

4

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[1]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Diack was insured on her alleged disability onset date, September 27, 2007, and remained insured through the date of the ALJ's decision.  (Tr. 24.)  Therefore, in order to be entitled to POD and DIB, Diack must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

---

[1] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Diack established medically determinable, severe impairments, due to bilateral trochanetric bursitis, fibromyalgia, obesity, adjustment disorder with depressed mood, borderline intellectual functioning, and personality disorder. (Tr. 24.) However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 25.) Diack was found incapable of performing her past relevant work, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 27, 37.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Diack was not disabled. (Tr. 37-38.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than

6

a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.

Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Treating Physician*

Diack argues that the ALJ violated the treating physician rule by failing to give "good reasons" for the weight he ascribed to several opinions from his treating rheumatologist, Van Warren, M.D., and another treating neurologist, Lisa Kurtz, M.D. (ECF No. 17 at 13-18.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all

8

of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[2] Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

On July 21, 2010, Dr. Warren reported that Diack could lift and/or carry no more than five pounds both frequently and occasionally. (Tr. 433-34.) Dr. Warren further opined that Diack could stand and/or walk two hours in an eight-hour workday in ten minute increments. (Tr. 433.) Diack's ability to sit, however, was unaffected, though he limited her to only four hours of sitting in one hour increments. *Id*. With respect to postural restrictions, Dr. Warren felt that Diack could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. He also indicated that her ability to reach, handle, and push/pull were affected. (Tr. 434.) The following environmental restrictions were also affected: heights, moving machinery, temperature extremes, fumes, and vibrations. *Id*.

On May 5, 2011, Dr. Warren completed a "Lupus (SLE) Medical Source Statement." (Tr.

---

[2] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

293-94.) Therein, Dr. Warren reported that Diack fulfilled the diagnostic criteria for systemic lupus erythematosus (SLE) identified by the American College of Rheumatology. (Tr. 293.) He also indicated that Diack suffers from fibromyalgia and lumbar osteoarthritis. *Id*. He found tenderness in the knee and ankle joints as well as severe fatigue and malaise. *Id*. He opined that Diack could lift and/or carry no more than ten pounds both frequently and occasionally. *Id*. Dr. Warren further reported that Diack could stand and/or walk three hours in an eight-hour workday in fifteen minute increments. (Tr. 294.) Diack's ability to sit, however, was unaffected. *Id*. Dr. Warren indicated that Diack would require unscheduled fifteen minute breaks every two hours. *Id*. With respect to postural restrictions, Dr. Warren opined that Diack could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. Dr. Warren estimated that Diack would be "off task" 15 percent of the time during a typical workday and that she would miss about three days per month as a result of her impairments or associated treatment. *Id*.

On December 22, 2010, Dr. Kurtz indicated that, due to joint pain and weakness secondary to lupus, Diack could lift and/or carry no more than eight pounds and could do so "very little" but "never" frequently. (Tr. 446.) Dr. Kurtz further opined that Diack could stand and/or walk five minutes in an eight-hour workday in thirty second increments. *Id*. She could sit for a total of two hours in thirty minute increments. *Id*. With respect to postural restrictions, Dr. Kurtz opined that Diack could never climb, balance, stoop, crouch, kneel, or crawl. (Tr. 447.) She also reported that Diack's ability to reach, handle, feel, and push/pull were affected. *Id*. The following environmental restrictions were also applicable: heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity, and vibrations. *Id*. Dr. Kurtz noted that Diack suffers from migraines, which were "triggered by environmental ... [and] caused by noise,

light smells." *Id*.

On April 9, 2011, Dr. Kurtz completed a "Lupus (SLE) Medical Source Statement." (Tr. 518-19.) Therein, Dr. Kurtz indicated that she was unable to offer an opinion as to whether Diack fulfilled the diagnostic criteria for SLE as she is not a rheumatologist. (Tr. 518.) She found that Diack suffers from migraine headaches, tremor, hip and leg pain, gait difficulty, insomnia, and photophobia. *Id*. She noted the presence of non-erosive arthritis involving pain in two or more joints with swelling, tenderness, and effusion, causing Diack's hips, knees, shoulders, elbows, and wrists to be affected. *Id*. She opined that Diack could lift and/or carry no more than two pounds and could do so "very, very little ... much less than 1/3 of an 8-hr day." *Id*. Dr. Kurtz further felt that Diack could stand and/or walk zero hours in an eight-hour workday. (Tr. 519.) Diack's ability to sit was also affected, as she could sit less than two to three hours in fifteen minute increments. *Id*. She did not indicate whether Diack would require unscheduled breaks, as she believed Diack was unable to work and the question was not applicable. *Id*. With respect to postural restrictions, Dr. Kurtz opined that Diack could never climb, balance, stoop, crouch, kneel, or crawl due to severe arthritis and severe joint pain secondary to lupus. *Id*. Dr. Warren estimated that Diack would be "off task" 25 percent or more during a typical workday and that she would miss more than four days per month as a result of her impairments or associated treatment. *Id*.

With respect to Dr. Warren's opinions, the ALJ ascribed the following weight:

> The undersigned does not give full weight to Dr. Warren's opinion because it is not supported by his treatment records and appears to be based on the claimant's subjective complaints. Dr. Warren's treatment records contain no findings of motor weakness nor are they noted elsewhere in the record. For example, the claimant's primary care physician, Olga B. Kovacevic, M.D., noted on May 21, 2010 that the claimant had full range of motion in the hips and no leg weakness

11

> (Exhibit 25F, p. 3). Dr. Kovacevic noted that the claimant reported that she required a wheelchair for assistance with ambulation, but did not indicate that this was necessary. Dr. Warren's treatment records do not provide the basis for the limitations on sitting, standing, walking, postural and environmental limitations, aside from the claimant's subjective complaints. Dr. Warren's opinions conflict with the claimant's reported activities. The claimant is able to drive, prepare simple meals, vacuum, use the computer, play cards, and lift up to 20 pounds (Exhibits 8E, pp. 6, 8-10 and 16E, p. 6). For these reasons, the undersigned did not give full weight to Dr. Warren's opinion.

(Tr. 30-31.)

With respect to Dr. Kurtz's opinions, the ALJ ascribed the following weight:

> The undersigned gave less weight to Dr. Kuntz's [sic] opinions because they are not supported fully by her treatment notes and they are inconsistent with each other, the evidence as a whole and the claimant's activities. Although Dr. Kuntz noted in her treatment records that the claimant presented in wheelchair at the initial visit there is no indication that Dr. Kuntz evaluated the necessity of the wheelchair. There is no evidence to show that a physician prescribed an ambulatory device for the claimant (see Exhibit 16E, p. 8). The claimant testified that her husband purchased the wheelchair for her four or five years previously. Aside from Dr. Raina's August 2008 note of a painful gait (Exhibit 4F, p. 5), the evidence demonstrates that the claimant walked with a normal gait or no more than a mild limp and had full lower extremity strength (Exhibits 4F, pp. 15-18 and 8F). Dr. Kuntz stated that the claimant's limitations were due, in part, to swelling and effusion of several joints. This statement is not supported by her treatment notes, or the April 1, 2011 MRI of the pelvis (Exhibit 24F, pp. 1-2), and is inconsistent with Dr. Warren's treatment notes indicating no swollen joints (Exhibits 21F and 23F). Dr. Kuntz's opinions are inconsistent with each other in that she stated the claimant could lift eight pounds in December 2010 and only two pounds in April 2011. Dr. Kuntz's treatment notes do not explain this decline in lifting ability over a four-month period nor is it explained by other evidence of record. Dr. Kuntz stated the claimant could stand and/or walk for five minutes of an eight-hour workday in December 2010, but not at all in April 2011. Likewise, this decline is functioning is not explained by Dr. Kuntz's treatment notes or the evidence as a whole. Dr. Kuntz's April 2011 opinion suggests that the claimant is completely wheelchair bound. As discussed above, the necessity of the wheelchair is not established in the record. Dr. Warren did not indicate that the claimant presented in a wheelchair and did not indicate that she required one. His opinion that the claimant can stand and/or walk for two hours of an eight-hour workday suggests that he did not find the claimant to be wheelchair bound (Exhibit 18F). Dr. Kuntz's opinions are inconsistent with the claimant's ability to drive, shop, use a computer, and prepare simple meals (Exhibit 8E, pp. 6, 8, and

12

> 9). The undersigned did not give full weight to Dr. Kurtz's opinions regarding the claimant's mental limitations, as there is no indication that Dr. Kurtz has mental
> health expertise and her opinions appear to be based on the claimant's subjective complaints rather than a mental health evaluation. For the foregoing reasons, the undersigned gives less weight to Dr. Kuntz's opinions.

(Tr. 32.)

Though the ALJ characterizes the weight he ascribed to Dr. Kurtz's opinions as "less weight" and did not give "full weight" to Dr. Warren's opinion of July 2010, given the RFC finding (Tr. 27), it is more accurate to say that the ALJ rejected most of the limitations assessed by Drs. Kurtz and Warren.[3] The ALJ makes no mention of Dr. Warren's May 2011 opinion completed shortly before the hearing.

The rejection of the opinions of Drs. Warren and Kurtz are both based primarily on the ALJ's belief that the opinions were not supported by the doctors' own treatment notes. (Tr. 30, 32.) The ALJ, however, is not a medical expert and it is well-established that an ALJ may not substitute personal opinions for those of medical professionals. *See, e.g., Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (*citing McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted); *Pietrunti v. Director, Office*

---

[3] In relevant part, the ALJ found Diack could lift/carry 20 pounds occasionally and 10 pounds frequently, sit/stand/walk for six hours each with normal breaks, and has no postural limitations. (Tr. 27.) This finding necessarily implies that the ALJ rejected the standing/walking limitations found by both physicians, the sitting restrictions found by Dr. Kurtz in both her opinions and in Dr. Warren's earlier opinion, the lifting/carrying restrictions and postural limitations found by both physicians, several environmental restrictions found by both physicians, and the opinion that Diack would miss three or more days per month due to her impairments or treatment thereof.

13

*of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2nd Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'"); *Stallworth v. Astrue*, 2009 WL 2271336 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (*quoting Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). The Court finds the reasoning of another case from this district with analogous facts to be persuasive:

> [I]t appears that [the ALJ] has attempted to circumvent the treating source rule by giving greater weight to his own interpretation of the treatment notes. The ALJ's failure to identify other opinion evidence contained in the treatment notes leaves the Court to determine whether the notes actually contain opinions that are inconsistent with the formal treating source opinions or whether the ALJ has simply formulated his own medical opinion as a layperson interpreting the treatment notes. *See Martin v. Commissioner of Social Sec.*, No. 1:08–CV–00301, 2009 WL 3110203 at *11 (S.D.Ohio Sept.24, 2009), unreported ("An ALJ, as a layperson, may not substitute his own opinions for those of the expert doctors.") *citing Brown v. Apfel*, 174 F.3d 59 (2nd Cir.1999); *Miller v. Chater*, 99 F.3d 972 (10th Cir.1996).
>
> ***
>
> The undersigned recommends that the Court find an additional flaw in the ALJ's logic. The ALJ considered treatment notes inherently more reliable because they are maintained in the course of treatment; however, his logic undermines his conclusion. Treatment notes are maintained for the purpose of improving a patient's condition, and they . . . may often speak in terms of maladies, not functional capacities. *Cf. Griffeth*, 2007 WL 444808 at *4 ("The RFC describes 'the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from-though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities.'") *quoting Howard*, 276 F.3d at 240. Therefore, it is improper for the ALJ to assign greater weight to treatment notes,

14

> which are in most instances not written with the intention of outlining functional limitations. When the ALJ considered the treatment notes to be inherently more reliable than treating source opinions, he simply chose to abandon the treating source rule, which requires him to look at the treating sources opinions and afford them controlling weight if they are "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2); 416.927(d)(2). Here, the ALJ did not follow the regulations and implemented a rule of logic that would always displace the treating source's opinion and permit the ALJ to substitute his own lay judgment on a review of the treatment notes.

*Harmon v. Astrue,* 2011 WL 834138 (N.D. Ohio Feb. 8, 2011) *report and recommendation adopted*, 2011 WL 825710 (N.D. Ohio Mar. 4, 2011). As such, the ALJ's reliance on his own interpretation of the treatment notes was an insufficient basis for rejecting Dr. Warren's assessment as to Diack's functional limitations.

The ALJ also found that Diack's reported activities were inconsistent with limitations ascribed to her by Dr. Warren. (Tr. 31.) Specifically, the ALJ noted that Diack can "drive, prepare simple meals, vacuum, use the computer, play cards, and lift up to 20 pounds (Exhibits 8E, pp. 6, 8-10 and 16E, p. 6)." Where a claimant's self-reported abilities are greater than those ascribed to her by a treating physician, it is certainly reasonable for an ALJ to discount a treating physician's opinion on that basis. Here, however, it is unclear how the claimant's rather limited activities conflict with Dr. Warren's opinion. Diack did state that she could lift about 20 pounds in July of 2008, but also stated that her "hands cramp & hurt if I hold something to [sic] long." (Tr. 191.) As such, the ALJ adequately explained his reasons for rejecting the treating doctors' lifting/carrying assessment.

Nonetheless, the Court fails to see how Diack's other limited activities constitute a good reason for rejecting the remainder of Dr. Warren's opinion. Though she stated that she can drive, she did not state how long she can drive. (Tr.189.) At the hearing, she stated her husband

15

does most of the driving. (Tr. 64.) Since driving, as well as playing cards and using the computer, are sedentary, it is not inconsistent with Dr. Warren's opinion that Diack could sit for four hours in a workday in one hour increments. (Tr. 433.) While Diack did state that she "vacuums the living room," she explained that she does so only once a week and that the task takes her 25 minutes to accomplish. (Tr. 189.) While she prepared meals for herself and her family, she usually made something easy such as a sandwich and breakfast was simply cereal. (Tr. 187-88, 238.) Preparing a meal took her about twenty minutes. (Tr. 188.) It is unclear how these activities conflict with Dr. Warren's opinion that Diack could stand and/or walk for two to three hours in an eight-hour workday in ten to fifteen minute increments. (Tr. 294, 433.) As such, Diack's self-reported activity level does not constitute a good reason for rejecting Dr. Warren's assessment. *See, e.g., Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir.1967) ("[t]he fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by [claimant]."); *accord Davisson v. Astrue*, 2011 U.S. Dist. LEXIS 64263 at *29 (N.D. Ohio, June 17, 2011); *Schlote v. Astrue*, 2012 WL 1965765 (N.D. Ohio, May 31, 2012).

In addition, while the ALJ expressly included fibromyalgia among Diack's severe impairments, the ALJ failed to include any discussion as to whether her fibromyalgia symptoms might account for the limitations assessed by Drs. Warren and Kurtz. Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3 (6th Cir. 2007) (*quoting*

Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (*quoting Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988). CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.*; *see also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Id*. at 818. Individuals suffering from fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers*, 486 F.3d at 244 (*quoting Preston*, 854 F.2d at 820).

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. There is no serious doubt that [the claimant] is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 British Med. J. 386 (1995); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988) (*per curiam*), but most do not and the question is whether [claimant] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996)

Therefore, objective medical evidence corroborating allegations of pain will most likely be

17

nonexistent, resulting in even greater emphasis on the credibility of a claimant's subjective allegations of the severity of her pain. The ALJ's strong focus on the lack of corroborating tests and physical symptoms (*i.e.* lack of swelling, good range of motion, lack of motor weakness) reveals a fundamental misunderstanding of the nature of the disease. (Tr. 30-32.) As such, the ALJ's reliance on the lack of corroborating tests and examination results to reject the opinions of treating physicians does not constitute a "good reason" in this context.[4] As such, it should not be surprising in a fibromyalgia case to find that a treating physician's notes do not contain objective tests that confirm a patient's limitations.

Finally, the ALJ also plainly rejected Dr. Warren's diagnosis that Diack suffered from lupus, as the ALJ found that the evidence did not establish lupus as a medically determinable impairment, specifically noting that the record does not contain a current diagnosis of lupus by a rheumatologist. (Tr. 25.) Notably, the ALJ also observed that "Dr. Warren, the claimant's current rheumatologist, has not diagnosed the claimant with [lupus]." *Id.* This finding is at odds with the May 5, 2011 medical source statement completed by Dr. Warren, wherein he opined that Diack fulfilled the diagnostic criteria for systemic lupus erythematosus identified by the American College of Rheumatology. (Tr. 293.) The ALJ's opinion does not even mention this

---

[4] The ALJ noted that, on May 21, 2010, Dr. Kovacevic did not indicate that a wheelchair was was medically necessary but only observed that Diack was using one. (Tr. 30.) A review of this treatment note simply reveals that Dr. Kovacevic offered no opinion whatsoever as to whether a wheelchair was required or whether Diack had standing/walking limitations. (Tr. 467.) Because Dr. Kovacevic did not offer any opinion that conflicted with or undermined Dr. Warren's assessment as to Diack's ability to stand/walk, the ALJ's reliance on it to discredit said opinion was unreasonable. Moreover, Dr. Kovacevic's treatment note offers even less support for rejecting the remaining non-ambulatory limitations assessed by Dr. Warren.

diagnosis.[5] As such, the ALJ failed to give good reasons for rejecting this diagnosis.

The Court finds that the ALJ erred (1) by not giving good reasons for rejecting the limitations assessed by Dr. Warren, (2) by not giving good reasons for rejecting Dr. Warren's diagnosis of lupus, and, (3) for failing to discuss how Diack's fibromyalgia factors into the supportability of the treating physicians' opinions and her credibility. As such, the Court need not address whether the reasons given for rejecting the opinion of Dr. Kurtz were also insufficient.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: July 23, 2013

---

[5] Diack's second assignment of error asserts that the ALJ erred by not stating valid reasons for finding that lupus was not a severe impairment. (ECF No. 17 at 18.) In this Court's opinion, this argument is part and parcel of the argument that the ALJ failed to give good reasons for rejecting the opinions of Dr. Warren – including his lupus diagnosis.